IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


| | |
|---|---|
| JEFF and JENNY LONG, Individually and o/b/o JOHN DOE, a minor,  )<br>)<br>Plaintiffs,  )<br>)<br>v.  )<br>)<br>SUMNER COUNTY BOARD OF EDUCATION )<br>and DONNA WEIDENBENNER  )<br>Individually and in her official capacity )<br>as Special Needs Teacher of  )<br>Station Camp Elementary School,  )<br>)<br>Defendants.  ) | Civil Action No. 3:09-cv-1013<br><br>Judge Thomas A. Wiseman, Jr.<br>Magistrate Judge Juliet E. Griffin |

## MEMORANDUM OPINION

Before the Court is Defendant Sumner County Board of Education's Motion for Summary Judgment (Doc. No. 72). Defendant Donna Weidenbenner has filed her own separate motion for summary judgment (Doc. No. 76), incorporating by reference the Board's Memorandum in Support of its motion as well as the Board's Concise Statement of Material Facts. Plaintiffs have filed their response in opposition to the motions, which have now been fully briefed and are ripe for resolution.

Defendants previously filed motions to dismiss and to strike certain portions of the Complaint. On September 20, 2010, the Court denied the motion to strike, denied the Rule 12(b)(1) motions to dismiss for failure to exhaust under the IDEA, and granted in part the 12(b)(6) motions by dismissing without prejudice the Rehabilitation Act and Section 504 claims (Count IV) asserted against the Board and by dismissing with prejudice (1) that portion of Count I alleging deprivation of John Doe's right to familial association; (2) Count III, alleging deprivation of Plaintiffs' rights to familial association; (3) the claims against the Board based directly on Weidenbenner's behavior based on a theory that she was an official policymaker for the Board; (4) claims against the Board based on the Board's purported special relationship with John Doe; and (5) the claims in Count IV (Rehabilitation Act and Section 504 claims (Count IV) against Weidenbenner in her official and individual capacities. (Sept. 20, 2010 Order, Doc. No. 57.) All other portions of the 12(b)(6) motions were denied.

As a result of the Court's ruling, there remained pending causes of action against both the Board and Weidenbenner under 42 U.S.C. § 1983. The claim against Weidenbenner, Count I, is premised upon allegations that Weidenbenner violated § 1983 by depriving John Doe, under color of law, of rights secured by the First and Fourteenth Amendments to the United States Constitution, "includ[ing], but . . . not limited to" freedom from the use of excessive force, the deprivation of liberty and property without due process of law, freedom from summary punishment, and freedom from the use of arbitrary government action which "shocks the conscience of a civilized society." (Compl. ¶ 21.)

The § 1983 claim asserted against the Board in Count II of the Complaint is based upon an alleged deliberate indifference on the part of the School Board manifested by failure to train or discipline teachers in the detection and prevention of abuse against students by teachers, or to investigate properly reports of abuse by teachers, all of which resulted in the alleged deprivation of John Doe's rights to "be free from unreasonable seizures, use of force and arbitrary governmental activity which shocks the conscience in violation of the rights secured to him by the Fourth and Fourteenth Amendment[s]." (Compl. ¶ 25.) Plaintiffs also seek to hold the Board liable under 42 U.S.C. § 1983 for Weidenbenner's actions "under the doctrines of agency, vicarious liability, employer-employee relations, master-servant, respondeat superior, joint venture, contract and as a result of their [sic] non-delegable duty to provide educational services to disabled persons in compliance with the constitution and laws of the United States and the State of Tennessee." (Compl. ¶ 30.)

In other words, all of Plaintiffs' claims are contingent upon a threshold finding that Weidenbenner actually violated John Doe's constitutional rights. As set forth herein, the Court finds that there is no plausible evidence in the record to suggest that Weidenbenner abused John Doe or caused him any physical injury, much less that she engaged in any behavior toward him or caused any injury of constitutional dimension.[1] For that reason alone, Defendants are entitled to summary judgment in their favor and dismissal of all claims asserted against them in this action.

## I.  STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is

---

[1] Plaintiffs have not asserted any supplemental state-law causes of action in their Complaint.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of the plaintiff's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party, on the other hand, must present sufficient evidence from which a jury could reasonably find for him. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The Court then must determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. In making this determination, the court must draw all reasonable inferences in favor of the non-moving party. *Nat'l Enters., Inc. v. Smith*, 114 F.3d 561, 563 (6th Cir.1997).

## II. STATEMENT OF FACTS

The Board has 46 schools, approximately 28,000 students, and approximately 4,200 employees including 46 principals and about 2,200 teachers. Defendant Weidenbenner was employed by the Board as a special-education teacher from 1991 until April 2009. During the 2008–2009 academic year, Weidenbenner was assigned to teach at Station Camp Elementary School, a Sumner County public school. Weidenbenner was licensed to teach by the State of Tennessee, and held the appropriate endorsements for the special-education preschool classroom in which she taught. She had been evaluated over the years with satisfactory results.

The Board has introduced abundant evidence regarding Weidenbenner's history, the supervision and oversight of her activities, and the fact that no one formally reported her for abusing any of the special-needs children in her care until the spring of 2009. Sometime in the early spring of 2009, special education teachers Daphne Fritz and Teresa Schweinsberg had a discussion in which Fritz expressed that she was upset about certain things she had observed in Weidenbenner's classroom and did not know what to do about it. Schweinsberg, in her deposition, did not recall that Fritz specified any particular behavior she was concerned about but Fritz recalls they discussed whether use of a weighted blanket and physically redirecting a head were appropriate. Schweinsberg suggested that Fritz talk to the principal or the special-education coordinator about her concerns.

On or about March 30, 2009, Schweinsberg gave Dr. Linda Cash, Principal of Station Camp Elementary School, a letter detailing her own concerns about Weidenbenner, including that she was

improperly restraining children and force-feeding them. Schweinsberg did not submit a report to the Department of Children's Services ("DCS") about Weidenbenner because she did not consider the conduct she had observed to rise to the level of child abuse. Dr. Cash, however, perceived the incidents related by Schweinsberg to be potentially abusive, so she made a report to DCS and to the school system's Human Resources Department. Authorities began an investigation into the complaint. After Schweinsberg submitted her letter, Daphne Fritz also submitted a letter to Cash detailing her concerns about Weidenbenner's treatment of the children in her care.

Weidenbenner was removed from the classroom on April 1, 2009. She later resigned. She was indicted in August 2009 on three counts of child abuse.

Plaintiff's minor child, John Doe, attended Station Camp Elementary School during the 2008–2009 academic year. He was three years old at the time. John Doe is disabled. He suffers from spastic cerebral palsy and microcephaly, which, among other things, significantly impair his ability to communicate verbally. He was placed in Weidenbenner's special-needs pre-school class.

The evidence to support allegations that Weidenbenner abused John Doe is scant at best. Weidenbenner's assistant teacher Cheryl Valenti testified that she witnessed Weidenbenner "verbally abusing at least once" every child that has filed a lawsuit against her and the School Board (Valenti Dep. 90:5–10), but she had no specific recollection of hearing her yell at John Doe. Another teacher, Daphne Fritz, testified she specifically recalled that John Doe was a child who "cries when he is not receiving one-on-one attention" and that she had seen Weidenbenner "yell in his face, stop, nobody wants to hear that." (Fritz Dep. 30:18–21.) Fritz also had overheard Weidenbenner yell at him, if he did not stop crying, "if you don't stop screaming, we'll just yell over you." (Fritz Dep. 30:22–25.) Valenti testified that she had witnessed Weidenbenner "slam" all the children into their chairs at various times, including John Doe (Valenti Dep. 92:9–12), but she did not indicate that this practice caused physical injury to any of the children.

John Doe's mother, Jenny Long, testified that on John Doe's first day of school, in October 2008, she had lunch with her son in the lunch room. That day, Weidenbenner fed John Doe, while Mrs. Long watched. The child was in a stroller because he didn't have a wheel chair yet. Long recalled that Weidenbenner sort of "put her legs . . . on top of him to keep him from kicking his feet." (J. Long Dep.

40:9–41:1.) She acknowledged that John Doe's condition, spastic cerebral palsy, caused him to flail his legs constantly. She claimed she was shocked to see Weidenbenner place her legs over the child, but she did not perceive this action to be abusive, her son was not injured, and she never complained about it or even mentioned it to anyone else.

Long also recalled Weidenbenner telling her at some point that John Doe was throwing his food, in response to which she would take it away from him altogether. (J. Long Dep. 54:21–55:1.) Long believed this conduct was abusive, but there is no evidence that her son went hungry or was malnourished as a result.[2]

John Doe was prone to throwing frequent temper tantrums even before starting school. Long believed however that after he began pre-school in Weidenbenner's class, his tantrums became even more frequent and more violent, and it became more difficult to console him when they did occur. When he threw a tantrum, he screamed, cried, flailed his arms and legs, and bit his arms. She testified in her deposition that he had never actually bitten or chewed on his arms before he attended Station Camp Elementary, although he had gummed or sucked on his arms. She recalled one day the bruising and marks on his arms was particularly bad to the point where she was alarmed by it and attempted to photograph the marks. She sent a text message to Weidenbenner asking her about it. Weidenbenner responded that John Doe had had a bad day at school, gotten very upset, thrown a tantrum, and was biting his arms. At that time Long felt this was an acceptable and credible response.

She learned one day from Weidenbenner that John Doe had a bowel movement in the potty chair. Jenny Long was "shocked" because she personally did not believe her son was ready to be potty trained, but she was also pleased and excited to hear he was making progress in that direction. On one occasion, she witnessed one of Weidenbenner's assistants place John Doe on the Rifton potty chair, which has sides and straps. She did not indicate that he seemed upset about it or that he resisted or threw a tantrum. She alleged, however, that shortly after learning he had been using the potty at school, she tried to put him on the training toilet at home, but he screamed and cried and threw a huge tantrum. She understood that he was frightened, so she stopped trying to toilet train him. She testified that since

---

[2] Although the complaint alleges that Weidenbenner repeatedly "force-fed" John Doe, Valenti specifically denied any recollection of witnessing Weidenbenner force feed this particular child. To the contrary, she recalled that he was "pretty good about eating" (Valenti Dep. 65:24, and "ate on his own." (Valenti Dep. 93:4–12.)

then, she has periodically tried to put him on the training toilet, but he resists and seems afraid of it so she does not persist. She acknowledged that she was never told by Weidenbenner or any of her assistants that John Doe was afraid of the Rifton chair or that he threw tantrums or became upset at school when he was being toilet-trained there. She further testified that she did not believe that placing the child on the Rifton chair at school was abusive or inappropriate.

On one occasion, Jenny Long came to pick her son up early from school and arrived during naptime. She discovered that her son had been put down for his nap in the back of the classroom in a small storage area or alcove. The area, which she estimated to be approximately four by ten feet in dimension, and does not have a door on it. John Doe was lying on his mat in this alcove. The teaching assistant explained that they had put him back there because he was keeping the other kids awake. He was awake but quiet. Mrs. Long believed her son was frightened at being alone back there but could not substantiate why she believed that.

Long testified that since being removed from Weidenbenner's class, her son's behavioral issues have been improving: She asserted that he is sleeping better at night, throwing fewer tantrums, and biting his arms less frequently. Long, however, was also questioned about some of her son's doctors' records, and acknowledged that the records reflected that she had reported "concerns with increased irritability" in September 2008, before John Doe started school. (J. Long Dep. 134:14–15.) More specifically, she reported that, over "the past three months, he has exhibited increased irritability. He is difficult to console and his behavior limits the family from going out to public activities. There are no triggers for his moods." (J. Long Dep. 136:11–14.) On his school intake forms, which Long filled out prior to John Doe's starting preschool, Long had noted that her son was "excitable, overactive, has many fears, cries easily, has temper tantrums, mood swings often, and wants a lot of attention." (J. Long Dep. 169:11–13.) Other forms and records indicate John Doe engaged in biting and chewing on his arms well before he went to school, and that his mother expressed concern about this practice at least as early as December 2007, more than a year before he started school. At one point, his physician recommended the use of some type of straps that would keep his arms extended so he could not reach them to bite them, but his mother did not want to use those.

**III.    ANALYSIS AND DISCUSSION**

Defendants have now filed their motions for summary judgment, asserting, among other arguments, that Weidenbenner's treatment of John Doe did not amount to a violation of his constitutional rights.

To establish municipal liability under § 1983, a plaintiff must show (1) the existence of a municipal policy or custom, and (2) that there is a causal link between the policy or custom and an alleged constitutional deprivation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). The thrust of Plaintiffs' claims against the School Board is that the Board is liable under § 1983 by virtue of an unconstitutional municipal policy, practice, or custom, pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and a failure to train, supervise, enforce policies or conduct adequate investigations of prior complaints, all of which led to a violation of their son's rights. Thus, the Board's liability is premised upon a threshold determination that defendant Weidenbenner's actions actually violated John Doe's constitutional rights. *City of Canton*, 489 U.S. at 385; *cf. Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (noting that the plaintiff, to succeed on her § 1983 claims against the municipality, must prove the deprivation of a constitutional right and that the school district was responsible for that violation). Obviously, whether Plaintiffs can recover damages from Weidenbenner also depends on whether they can establish that Weidenbenner violated their son's substantive due-process rights.

Clearly, not every tort rises to the level of a constitutional violation, *Paul v. Davis*, 424 U.S. 693, 699–701 (1976), and not every deprivation of a liberty or property right requires a pre-deprivation hearing or a federal remedy. *Ramsey v. Bd. of Educ.*, 844 F.2d 1268, 1273 (6th Cir. 1988). The Supreme Court has recognized that "corporal punishment in public schools implicates a constitutionally protected liberty interest," specifically, an interest in procedural due process, but the Court also held that the states' "traditional common-law remedies are fully adequate to afford due process." *Ingraham v. Wright*, 430 U.S. 651, 672 (1977). The Supreme Court has not reached the question of whether punishment inflicted in the educational context may implicate *substantive* due process rights, but the Sixth Circuit, along with most of the other Circuit Courts of Appeals, has found that it can. *Webb v. McCullough*, 828 F.2d 1151, 1159 (6th Cir.1987).

The seminal case addressing excessive force in public schools is *Hall v. Tawney*, 621 F.2d 607

(4th Cir. 1980). *See Saylor v. Bd. of Educ. of Harlan County*, 118 F.3d 507, 514 (6th Cir. 1997); *Webb*, 828 F.2d at 1158; *see also Gottlieb v. Laurel Highlands Sch. Dist.*, 272 F.3d 168, 173 (3d Cir. 2001) ("*Hall* now provides the most commonly cited test for claims of excessive force in public schools."). In *Hall*, the minor plaintiff was repeatedly paddled and was subsequently taken to the emergency room where she was admitted and kept for ten days for treatment of traumatic injuries to her left hip, thigh and buttock. She received treatment from specialists for possible permanent injuries to her lower back and spine. *Hall*, 621 F.2d at 614. In finding that the plaintiffs had stated a substantive due process claim in that case, the United States Court of Appeals for the Fourth Circuit proclaimed:

> In the context of disciplinary corporal punishment in the public schools, we emphasize once more that the substantive due process claim is quite different than a claim of assault and battery under state tort law. In resolving a state tort claim, decision may well turn on whether "ten licks rather than five" were excessive . . . so that line-drawing this refined may be required. But substantive due process is concerned with violations of personal rights of privacy and bodily security of so different an order of magnitude that inquiry in a particular case simply need not start at the level of concern these distinctions imply. As in the cognate police brutality cases, the substantive due process inquiry in school corporal punishment cases must be *whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience*. Not every violation of state tort and criminal assault laws will be a violation of this constitutional right, but some of course may.

*Hall*, 621 F.2d at 613 (emphasis added; citations omitted).

The Sixth Circuit expressly adopted this rationale in *Webb*, 828 F.2d at 1158, in which a high school girl on a school trip locked herself in the bathroom after the principal informed her that he was going to send her home upon his discovery of a boy and alcohol in her room. *Id.* at 1153–54. The principal became angry when he realized the girl had locked herself in the bathroom. He attempted to "jimmy" the lock, but when that failed he slammed into the door repeatedly with his shoulder. The door gave way knocking the girl against the wall and then onto the floor. The principal grabbed her from the floor, threw her against the wall and slapped her. *Id.* at 1154.

The Sixth Circuit, quoting from *Hall*, determined that there was at least a question of fact as to whether the plaintiff could recover for violation of her substantive due process rights. It reversed and vacated the district court's order granting the defendant's motion for summary judgment, stating:

> Because the alleged blows were not struck in the school context, where the need for immediate disciplinary control . . . is at its greatest, because [the principal] was *in loco parentis* to [the plaintiff], and because it is possible that the blows were not disciplinary in

> nature, a trier of fact could find that under the circumstances, [the principal's] need to strike [the plaintiff] was so minimal or non-existent that the alleged blows were a brutal and inhumane abuse of [the principal's] official power, literally shocking to the conscience.

828 F.2d at 1159. The Court also noted that the record did not reveal any reason for the blows or that "the blows arose other than in anger or from malice." *Id.* at 1158.

In the present record, while there is indeed some evidence that Weidenbenner engaged in behavior that may properly be characterized as inappropriate and abusive *against other children* in John Doe's class, there is not a shred of evidence that Weidenbenner abused or injured John Doe, much less caused him severe, conscience-shocking injury, either physical or psychological, or that she engaged in a "brutal and inhumane abuse of official power" in her dealings with him. In sum total, the evidence in this record indicates that Weidenbenner "verbally abused" John Doe by yelling at him to shut up or to stop crying. However, "[v]erbal abuse is not normally a constitutional violation." *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000); *see also Johnson v. Dallatifa*, 357 F.3d 539, 546 (6th Cir. 2004) (holding verbal abuse does not give rise to Eighth Amendment claim). On one occasion, John Doe was put down for his nap in a dark alcove of the classroom, but there is no evidence that he was shut into the room or that this practice harmed him in any way. There is evidence that Weidenbenner might on occasion have taken away John Doe's food if he began throwing it, but there is no evidence that he actually went hungry or was malnourished. Further, this practice had a clear pedagogical objective. Weidenbenner had a practice of placing her legs over John Doe's while she fed him, to keep him from flailing his legs about, but again there is no indication that this practice was painful or abusive. Mrs. Long testified in her deposition that she believed John Doe's behavioral problems became exacerbated after he was placed in Weidenbenner's class, but there is no objective evidence substantiating that claim. Moreover, there is no credible evidence that John Doe's behavioral issues were causally related to any actions by Weidenbenner.

In short, there is simply no evidence at all that Weidenbenner abused John Doe or violated his substantive due-process rights. Because a violation of those rights is a required element of the claims asserted against both the School Board and Weidenbenner individually under § 1983, those claims must fail and Defendants are entitled to summary judgment in their favor.

In an attempt to avoid summary judgment, Plaintiffs point to the their "Rule 26 Statement as to

David L. Corwin" and the "Psychological Report" submitted by Jay D. Woodman, Ph.D. In the Rule 26 Statement, Plaintiffs indicate that they expect Dr. Corwin to express his opinion that John Doe has been harmed psychologically as a result of witnessing abuse and being himself subjected to abuse by Weidenbenner. Dr. Corwin's opinion appears to be based at least in part on his apparently erroneous presumption that John Doe was force-fed by Weidenbenner and that Weidenbenner was criminally "convicted" as a result of force-feeding John Doe. Otherwise, Dr. Corwin's belief that John Doe was abused seems to be based entirely on John Doe's parents' opinions that his behavior changed for the worse after he was placed in Weidenbenner's class, and on allegations by two other teachers that they had witnessed behavior by Weidenbenner that they perceived as unnecessarily harsh even if not actually abusive. Dr. Woodman's "Report" and opinions are likewise based on John Doe's parents' fears that he might have been abused and their belief that his behavioral issues had worsened after he was placed in Weidenbenner's class. Based on that information, Dr. Woodman expresses his opinion that John Doe has post-traumatic stress disorder as a result of the "experiences . . . and the trauma that occurred for him" while he was in Weidenbenner's classroom, and that John Doe will need focused therapy for several years to overcome this trauma.

These unsworn reports are hearsay which may not be considered on a motion for summary judgment. *Pack v. Damon Corp.*, 434 F.3d 810, 815 (6th Cir. 2006); *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 619–20 (6th Cir. 2003). Even if they were in admissible form, the opinions of these doctors amounts to nothing more than speculation and supposition. Their opinion that John Doe has suffered abuse is based entirely on his parents' subjective belief that he might have been abused and that he began exhibiting subtle behavioral changes after being placed in Weidenbenner's classroom. As set forth above, however, there is not a shred of actual evidence in the record that John Doe was abused by Weidenbenner. The Court will not consider these reports, but concludes that, even if they were admissible, they would not change the outcome in this case.

## IV. CONCLUSION

Defendants' motions for summary judgment will be granted and this matter dismissed on the grounds that Plaintiffs have not demonstrated that John Doe suffered any abuse or injury, much less abuse or injury that rises to the level of a constitutional violation.

An appropriate Order will enter.

_____
Thomas A. Wiseman, Jr.
Senior U.S. District Judge